IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| Donald R. Triplett, Jr., | § | Case No. 19-42570 |
| | § | (Chapter 7) |
| Debtor. | § | |
| | § | |
| _____ | § | |
| | § | |
| Shawn Valk and Ron Valk, as Assignees | § | |
| of Estate Claims of Donald R. Tripplett, Jr., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Adv. Proc. No. 21-4109 |
| | § | |
| DFW Design & Remodeling, LLC, | § | |
| | § | |
| Defendant. | § | |

## <u>MEMORANDUM OPINION</u>

On October 24, 2022, this Court conducted a trial on the "Complaint to Avoid and Recover Transfers Pursuant to 11 U.S.C. §§ 544 and 550" filed by Shawn and Ron Valk (collectively, the "**Plaintiffs**" or the "**Valks**"), as assignees of the claims of Donald R. Triplett, Jr.'s bankruptcy estate, against DFW Design & Remodeling, LLC (the "**Defendant**" or "**DFW Design LLC**").  The Plaintiffs seek to avoid and recover two transfers (totaling $25,225.90) that Triplett allegedly made to the Defendant with actual or constructive fraudulent intent.  The Court allowed the parties to submit written closing and took this matter under advisement to prepare a detailed written ruling.  The Court exercises its core jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and

157(b)(2)(A), (H) and (O).  This Memorandum Opinion embodies the Court's findings of fact and conclusions of law.  *See* Fed. R. Bankr. P. 7052.[1]

## I. RELEVANT FACTUAL BACKGROUND

### A. The Debtor's Construction Business

1.      Prior to bankruptcy, Donald R. Triplett, Jr. (the "**Debtor**") was in the business of commercial and residential construction, remodeling, and design.  He did business as "DFW Design & Remodeling" and held a d/b/a account at Bank of America for his business as its sole proprietor.

2.      The Debtor testified that the business had its ups and downs but was profitable "most years."  He testified that the business had cash flow issues and that he would personally inject cash he had from other sources into the business to make sure creditors got paid.  The Debtor also testified that he used his personal credit cards for business expenses.

3.      The Debtor is married to Jose Doniceth "Doni" Escoffie.  Alex and Jose Escoffie are related to Doni, and the Debtor has raised them since they were ten or eleven years old.  The Debtor refers to Alex and Jose Escoffie as his sons or stepsons.

4.      Doni Escoffie introduced the Debtor to Jeremy Haltom ("**Haltom**").  Haltom's education is in information technology and computers, and he works for a cyber security company.

5.      In February 2013, the Debtor approached Haltom about investing in his construction business.  Haltom testified that he believed the purpose of the investment was to provide the balance of the funds the Debtor needed to purchase another, profitable remodeling business named "DFW Restoration Factory" and to merge that business with his existing one.

---

[1] To the extent any of the following findings of fact are construed as conclusions of law, they are hereby adopted as such.  Likewise, to the extent any of the following conclusions of law are construed as findings of fact, they are hereby adopted as such.

6.     On March 11, 2013, the Debtor formed DFW Design & Remodeling, LLC. ("**DFW Design LLC**").  The original Company Agreement listed the Debtor as the 100% owner of DFW Design LLC.

7.     Haltom testified that he transferred $165,000 to the Debtor on March 15, 2013. DFW Design LLC's records reflect that Haltom received a 10% interest in the company in exchange for his investment shortly after the Debtor formed DFW Design LLC.

8.     The Debtor continued operating DFW Design LLC for several years.  The Debtor met with Haltom periodically to discuss DFW Design LLC's finances, and Haltom claimed losses from DFW Design LLC on his tax return for at least one tax year.  However, Haltom never received a payment or distribution from DFW Design LLC.

9.     By late 2015, the Debtor had moved most of his bank accounts from Bank of America to Colonial Banking.  His new accounts at Colonial Banking included: (i) a personal bank account (ending in 9892); (ii) an account for DFW Design LLC (ending in 0151); and (iii) a d/b/a account for "Preferred Platinum Construction" (ending in 0204).

10.     At the start of 2016, the Debtor's d/b/a account for DFW Design remained open at Bank of America because it was overdrawn by $225.90.  On January 4, 2016, the Debtor wrote a check in the amount of $225.90 to "DFW Design" from his personal account at Colonial Banking. The Debtor noted "final deposit" on the check.  The Debtor promptly deposited the check into his d/b/a account for DFW Design at Bank of America, and the account was closed.

11.     The Debtor and Haltom opened a credit card account at Capital One for DFW Design LLC in or around February 2016.

12.     On March 11, 2016, the Debtor wrote a check in the amount of $25,000 to "DFW Design" from his personal account at Colonial Banking.  The Debtor noted on the check that it

was a "loan to DFW." The Debtor deposited the check into DFW Design LLC's account at Colonial Banking on the same day.

13.     Although the check to DFW Design LLC for $25,000 noted that it was a loan, the Debtor testified he considered it a capital contribution because he owned 90% of the company. (The Debtor contends that Haltom owns the remaining 10% on account of his investment in DFW Design LLC.) However, the $25,000 was not reported as a capital contribution on DFW Design LLC's tax forms. And the Debtor was winding down DFW Design LLC in March 2016.

14.     DFW Design LLC's bank statement for March 2016 reflects that the Debtor used the $25,000 to pay assorted business debts, including $5,832.43 to the Texas Comptroller, as well as to make payments on several of the Debtor's credit cards. For example, DFW Design LLC's bank statement for March 2016 includes the following payments on credit cards owned by the Debtor: Barklaycard ($337.12); Barclaycard ($391.13); Capital One ($392.68); Barclaycard ($428.83); Capital One ($400); and Citicard ($2,000). DFW Design's bank statement also reflects that it paid $573.02 to Humana, Inc., to maintain the Debtor's health insurance. The total amount of these payments relating to the Debtor and his personal debts was $4,522.78.

15.     On March 24, 2016, the Debtor transferred the balance remaining in DFW Design LLC's account, $81.08, back to his personal account at Colonial Banking. This brought DFW Design LLC's account balance to $0 as of March 25, 2016.

16.     The Debtor testified that he could not recall when DFW Design LLC stopped operating.

17.     Shawn Valk is also in the construction business and has worked with the Debtor on several projects. He testified that, at some point in early 2016, the Debtor told him he had sold DFW Design LLC and planned to open a new business called "DFW Design Flooring & More."

The Debtor, however, testified that he planned to "merge" DFW Design LLC with the Valks' business.

18.     In March 2016, the Debtor was working on several construction projects for Shawn Valk and his father, Ron Valk, who were doing business as "Platinum Construction." He expected to be paid $131,000 for his work on one project and had other outstanding receivables. The Debtor testified that he was "struggling a bit" in early 2016 because the Valks had delayed paying for his work on their construction projects.

19.     The Debtor's bank records show that approximately $435,000 was deposited into his personal accounts at Colonial Banking in May 2016. The Debtor testified that these funds represented the $131,000 the Debtor was owed for his work as of March 2016 as well as his share of the profit arising from the completion of a project with the Valks. The Debtor quickly used all the funds to pay some of his outstanding business and personal debts. As of June 2016, the Debtor's account at Colonial ending in 0204 had a balance of ($92.30), and his d/b/a account for "Preferred Platinum Construction" ending in 9892 had a balance of $372.10.

20.     It is unclear from the record how or whether the Debtor received a salary or any other distribution from DFW Design LLC during the relevant period. According to his 2016 income tax return, DFW Design LLC operated at a loss during 2016, and the Debtor's adjusted gross income was $24,751.

21.     According to the proofs of claim filed by the Valks, they had agreed to retain the Debtor to supervise various construction projects by August 2016. They allege that the Debtor orally agreed to devote his exclusive time, labor and effort to the Valks' business, Platinum Construction, to serve and act as a construction supervisor for Platinum Construction's projects and job sites.

22.    The Debtor's relationships with the Valks and Haltom had soured by September 2017.  Haltom sued the Debtor in state court in late 2017.  He attached a copy of his complaint to his proof of claim in the Debtor's bankruptcy case.  In his complaint, Haltom asserts claims against the Debtor relating to the use of the funds Haltom invested in DFW Design LLC and the Debtor's alleged misrepresentations regarding the financial condition of DFW Design LLC.

23.    In January 2018, the Valks sued the Debtor for theft of labor in the amount of $350,000, among other things.  In addition, in early 2018, Shawn Valk sued the Debtor over their respective ownership interest in TV Arrowhead, LLC ("**TV Arrowhead**").

24.    According to documents filed in the Debtor's bankruptcy case, Shawn Valk and the Debtor were managing members of TV Arrowhead, whose only asset was a lake house.  A dispute arose between the Debtor and Shawn Valk regarding the allocation of capital contributions to TV Arrowhead, and Valk sued the Debtor, seeking to wind up the business.

25.    The state court approved a sale of the lake house for $625,000, and the sale was set to close on September 20, 2019.  The day before the closing, the Debtor filed a bankruptcy petition.

**B. The Debtor's Bankruptcy Case**

26.    The Debtor filed a petition for relief under Chapter 7 of the Bankruptcy Code on September 19, 2019.

27.    Shawn Valk promptly moved for relief from the automatic stay so the sale of the lake house could proceed.  This Court granted the motion.[2]

28.    The Debtor subsequently filed his required bankruptcy schedules and statements.

---

[2] The sale of TV Arrowhead's lake house closed on September 30, 2019, and the Chapter 7 trustee received net sales proceeds of $578,000.24 to hold in escrow pending a resolution of the ownership dispute with Shawn Valk.  This Court subsequently approved a compromise and settlement agreement between the Chapter 7 trustee and Shawn Valk whereby the estate received $153,708.90 of the sales proceeds.

29.    In his bankruptcy schedules, the Debtor stated that the value of his home was $225,000.  The Debtor reported less than $50 in several checking accounts and no interest in any retirement or investment accounts on his petition date.

30.    In his "Statement of Financial Affairs" ("**SOFA**"), the Debtor identified numerous legal actions in which he was a party in the year preceding bankruptcy.  The litigation included lawsuits by and against the Debtor, Ron Valk, Shawn Valk and the Valks' business, Platinum Construction (which is distinct from the Debtor's similarly named d/b/a, Preferred Platinum Construction).  The litigation also included two lawsuits brought against the Debtor by Haltom.

31.    The Debtor exempted his home and household items from his creditors.  His primary non-exempt assets were his claims against the Valks and Valk-related entities, and his interest in TV Arrowhead.

32.    In his "Schedule A/B: Property," the Debtor stated that Ron Valk owed him an unknown amount of money.  The Debtor described Ron Valk's alleged debt to him as follows:

> Platinum Construction Ron Valk owes debtor for multiple projects completed for him. They have liens on them. He also owes me for product he stole. As well as money for construction work completed on his personal home and office. All subject to ongoing law suits. Also owed 10% if [sic] backend profit on two commercial building sales.

33.    In his "Schedule A/B: Property," the Debtor listed the following accounts receivable in the total amount of $221,061 owed to him by Ron Valk:[3]

> Ronald Valk- Platinum Construction Maple $77,000
> Ronald Valk- Platinum Construction Locus Grove $54,061.00
> Ronald Valk Personal $30,000.00
> Ronald Valk Saro LLC $60,000.00

---

[3] In the claim filed by Ron Valk in this case, discussed infra, he explains that he seeking to recover from the Debtor with respect to the "Maple Avenue Project" and "Locus Grove Project" based on the Debtor's alleged fraud.

34.    In his "Schedule A/B: Property," the Debtor stated that he had a 50% interest in TV Arrowhead, which he valued at $325,000.

35.    In his "Schedule E/F: Creditors Who Have Unsecured Claims," the Debtor listed a total of $3,128,635.86 in liabilities. His undisputed debts included a priority claim for debt owed to the Internal Revenue Service ("**IRS**") in the estimated amount of $160,000. The IRS filed a proof of claim in the total amount of $173,413.61 for taxes due for tax years 2006, 2007, 2008, 2010, 2011, 2014, 2017 and 2018.

36.    The Debtor's bankruptcy schedules included numerous unsecured, non-priority creditors on the petition date, including Capital One Bank, Barklay's Bank, Citibank, Colonial Bank, Cowboys Card Services, Credit One, and First National Credit Card. The Debtor listed each of their claims as undisputed.

37.    The Valks filed the following claims against the Debtor in his bankruptcy case: (i) Claim No. 31-1 filed by Ron Valk d/b/a Platinum Construction as a general unsecured claim in the sum of $591,000.00 for asserted breach of contract, breach of warranty, theft/conversion, and fraud, and (ii) Claim No. 32-1 filed by Shawn Valk d/b/a Platinum Construction as a general unsecured claim in the sum of $591,000.00 for asserted breach of contract, breach of warranty, theft/conversion, and fraud.

38.    Claim numbers 31-1 and 32-1 are identical. The Valks detail their allegations in the litigation they brought against the Debtor in 2018 in Texas state court regarding theft of labor, among other things. The litigation was pending in state court when the Debtor filed for bankruptcy.

39.    The Debtor's bankruptcy schedules and statements, and the claims filed in his case, show that several state court judgments were entered against him in the years leading up to bankruptcy. For example, the Debtor listed an undisputed, unsecured debt of $32,512.46 owed to

Kevin Otto, which arises from a judgment entered in a lawsuit brought by Otto in 2014 according to the Debtor's SOFA. The Debtor also listed an undisputed, unsecured debt owed to Sheldon Snyder, which arises from a judgment entered in a lawsuit brought by Snyder in 2012 according to the Debtor's SOFA. Snyder filed Claim No. 39-1 in the Debtor's bankruptcy case, which attached the state court judgment entered on October 18, 2018, in the amount of $88,217.39. And on August 19, 2019, a state court entered a final judgment against the Debtor in the principal amount of $174,926.70 in favor of Keith Black, who sued the Debtor in 2018 according to the Debtor's SOFA. Black filed Claim No. 34-1 in the Debtor's bankruptcy case. All these judgments remained unpaid on the petition date.

40. On August 3, 2021, the Chapter 7 trustee filed a motion seeking approval of the sale of certain claims and causes of action. As described in the motion, the estate held an interest in one or more claims or causes of action that had been asserted or could have been asserted in several lawsuits that were pending on the petition date as well as potential avoidance actions.

41. Shawn and Ron Valk offered to purchase all the estate claims and rights described in the trustee's motion. In consideration for the estate's sale and assignment of its claims and rights, the Valks agreed to (i) pay the estate the sum of $50,000.00 and (ii) the subordination of the Valk proofs of claim to all allowed claims in the bankruptcy case.

42. The Debtor objected to the proposed sale. Following a hearing on August 26, 2021, the Court approved the Chapter 7 trustee's sale motion over the Debtor's objection.

43. Shawn and Ron Valk subsequently initiated this adversary proceeding seeking to avoid and recover two allegedly fraudulent transfers made by the Debtor to his business, DFW Design LLC, more than three years prior to bankruptcy. In addition, the Valks initiated proceedings seeking to recover alleged fraudulent transfers from the Debtor to his husband and his

husband's business (Jose Doniceth "Doni" Escoffie and Copper Creek Distributors, Inc., Adv.

Proc. No. 21-4106, for $158,807.43), the Debtor's putative son (Alejandro "Alex" Escoffie, Adv.

Proc. No. 21-4107, for $17,012.81), another putative son (Jose S. Escoffie, Adv. Proc. No. 21-

4108, for $6,568.85), and the Debtor's friend and his friend's business (Darryl Briggs and Copper

Creek Properties, LLC,, Adv. Proc. No. 21-4110, for $9,427.84).[4]

44.     The present adversary proceeding against DFW Design LLC does not involve any

of the claims asserted in the Valk proofs of claim or any of the pre-petition litigation by or against

the Debtor.  Rather, in this adversary proceeding, the Valks seek to establish that the following

transfers from the Debtor to DFW Design LLC were actually or constructively fraudulent under

the Texas Uniform Fraudulent Transfer Act ("**TUFTA**"), Tex. Bus. Com. Code §§ 24.001 *et seq.*:

| Deposit Date | From | To | Amount |
|---|---|---|---|
| 1/5/2016 | Triplett – *9892 | DFW Design & Remodeling, LLC | $225.90 |
| 3/11/2016 | Triplett – *9892 | DFW Design & Remodeling, LLC | $25,000.00 |
|  |  |  | **$25,225.90** |

## II. DISCUSSION

1.     Within a bankruptcy adversary proceeding, a trustee may avoid transfers that are

avoidable under state law through 11 U.S.C. § 544(b)(1).  Here, the Valks invoke § 544 to pursue

a claim to avoid transfers made with the actual intent to defraud under TUFTA § 24.005(a)(1) or

with the constructive intent to defraud under TUFTA §§ 24.005(a)(2) and 24.006(a).

2.     As an initial matter, DFW Design LLC argued in its closing statement that the Valks

failed to establish the existence of a "triggering" creditor necessary to invoke § 544.  Section 544(a)

allows a bankruptcy trustee to "avoid any transfer of an interest of the debtor in property or any

---

[4] The Court tried this matter on October 24, 2022, as noted above.  The Court separately tried Adv. Proc. No. 21-4106 on December 6, 2022, and Adv. Proc. Nos. 21-4107 and 21-4108 on December 7, 2022.  Finally, the parties settled Adv. Proc. No. 21-4110 prior to trial.

obligation incurred by the debtor that is voidable under applicable law *by a creditor holding an unsecured claim that is allowable ...*" 11 U.S.C. § 544(b)(1) (emphasis added). Thus, the Valks can bring a fraudulent transfer action under § 544(b) only if there is a "triggering" unsecured creditor that could have brought a TUFTA action when the Debtor filed his bankruptcy petition.

3.     Inasmuch as the Valks have asserted an avoidance action under TUFTA §§ 24.005(a)(1)-(2) and 24.006(a), the Valks must identify a creditor who had standing to bring the applicable TUFTA claims on the date the Debtor filed his bankruptcy petition.  Section 24.006(a) differs from § 24.005(a)(2) in that it is available only to creditors whose claims arose before the transfer took place, while § 24.005(a)(2) is also available to creditors whose claims arose within a reasonable time after the transfer.  This distinction is a distinction without a difference in this case because the Debtor has multiple qualifying creditors with claims that arose before the transfers

4.     The Debtor's schedules and SOFA contain numerous "triggering" creditors, who were creditors when the Debtor made the challenged transfers (from February 2016 through July 2019) and could have brought an action under TUFTA §§ 24.005(a) or 24.006(a) on the Debtor's bankruptcy petition date.  These creditors include Kevin Otto and Sheldon Snyder, who had filed lawsuits against the Debtor prior to any of the challenged transfers, and, notably, the IRS.

5.     Having established the existence of a "triggering" creditor, the Court turns to the substance of the Valks' claims seeking to establish that the Debtor transferred funds to DFW Design LLC with the actual or constructive intent to defraud his creditors.

### A. Actual Intent to Defraud

6.     Section 24.005(a)(1) of TUFTA provides the statutory authority under Texas law to enable avoidance of a transfer made "with actual intent to hinder, delay, or defraud any creditor of the debtor." TEX. BUS. & COM. CODE § 24.005(a)(1).  Whether a transfer was made with actual

fraudulent intent is a fact question. *Walker v. Anderson*, 232 S.W.3d 899, 914 (Tex. Civ. App. –

Dallas, 2007). Given that direct evidence of actual intent is rarely available, courts typically rely

on circumstantial evidence, known as badges of fraud, to infer intent. *In re Soza*, 542 F.3d 1060,

1067 (5th Cir. 2008).

7.      TUFTA provides a non-exclusive list of badges of fraud that may be considered

to find actual intent on the part of a debtor. *See* TEX. BUS. & COM. CODE § 24.005(b) (stating

"consideration may be given, among other factors, to" the listed badges of fraud). The badges of

fraud listed in the statute include:

> (1) the transfer or obligation was to an insider; (2) the debtor retained possession
> or control of the property transferred after the transfer; (3) the transfer or obligation
> was concealed; (4) before the transfer was made or obligation was incurred, the
> debtor had been sued or threatened with suit; (5) the transfer was of substantially
> all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or
> concealed assets; (8) the value of the consideration received by the debtor was
> reasonably equivalent to the value of the asset transferred or the amount of the
> obligation incurred; (9) the debtor was insolvent or became insolvent shortly after
> the transfer was made or the obligation was incurred; (10) the transfer occurred
> shortly before or shortly after a substantial debt was incurred; and (11) the debtor
> transferred the essential assets of the business to a lienor who transferred the assets
> to an insider of the debtor.

*Id.* at § 24.005(b)(1–11). *See also In re Soza*, 542 F.3d at 1066. "Not all, or even a majority, of

the 'badges of fraud' must exist to find actual fraud. Indeed, '[w]hen several of these indicia of

fraud are found, they can be a proper basis for an inference of fraud.' " *Id.* at 1067 (quoting *Roland*

*v. U.S.*, 838 F.2d 1400, 1403 (5th Cir. 1988).

8.      However, while "TUFTA operates to prevent debtors from defrauding creditors by

placing assets beyond their reach, ... it also protects transferees 'who took in good faith and for a

reasonably equivalent value.' " *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 573 (Tex. 2016).

For this reason, if "a reasonable equivalent has been given in good faith for a transfer or obligation

[the transferee has] a *complete defense* although the debtor is shown to have intended to hinder,

delay, or defraud creditors." *Id.* (quoting UNIF. FRAUDULENT TRANSFER ACT, 7A pt. II

U.L.A. 6 (2006) (internal quotations omitted) (emphasis in original)); *see also* TEX. BUS. & COM.

CODE § 24.009(a) ("A transfer or obligation is not voidable under Section 24.005(a)(1) of this code

against a person who took in good faith and for a reasonably equivalent value or against any

subsequent transferee or oblige."). Importantly, "whether consideration has value is a distinct

inquiry from whether the exchange of consideration enhanced or gave rise to the debtor's

insolvency." *Janvey*, 487 S.W.3d at 576.

9.      In this case, as previously discussed, the Valks are seeking to establish that the

Debtor made two transfers to DFW Design LLC with the actual intent to defraud his creditors: (i)

a transfer of $225.90 on January 5, 2016, and (ii) a transfer of $25,000 on March 11, 2016.

10.     The Valks argue that the following badges of actual fraud are present: (i) the

transfers were to an insider, the Debtor's business; (ii) the Debtor retained possession or control

of the funds after the transfers; (iii) the Debtor did not receive reasonably equivalent value in

exchange for the transfers; (iv) the Debtor was insolvent or became insolvent shortly after the

transfers; and (iv) the Debtor operated as a fraudulent business enterprise at the time of the

transfers.

*Insider Status and Control*

11.     First, both transfers were made to an "insider" because they went to an entity that

the Debtor controlled – DFW Design LLC and the Debtor doing business as "DFW Design."

TUFTA defines "insider"—in pertinent part—as "a corporation of which the debtor is a director,

officer, or person in control." TEX. BUS. & COM. CODE § 24.002(7)(A)(iv). In this case, the Debtor

was the sole proprietor of "DFW Design," and after he incorporated the business, he owned at least

90% of DFW Design LLC and ran its operations.

12.     In addition, the Debtor retained effective control of the funds after the transfers.[5]

The Debtor decided and directed how his sole proprietorship, "DFW Design," and DFW Design

LLC would use the transferred funds.  And the Debtor used those funds to pay, among other things,

his personal obligations.

*Reasonably Equivalent Value*

13.     Next, reasonably equivalent value is a badge of fraud listed in TUFTA § 24.005(b)

that to determine actual intent under TUFTA 24.005(a)(1).   TEX. BUS. & COM. CODE §

24.005(b)(8).  "'Reasonably equivalent value' includes without limitation, a transfer or obligation

that is within the range of values for which the transferor would have sold the assets at an arm's

length transaction."  TEX. BUS. COM. CODE § 24.004(d).  Texas courts look to both state and federal

law for guidance in construing the phrase "reasonably equivalent value."  *In re Hinsley,* 201 F.3d

638, 643 (5th Cir. 2000) (applying TUFTA and looking to cases under 11 U.S.C. § 548(a)(2)).

"The proper focus is on the net effect of the transfers on the debtor's estate, the funds available to

the unsecured creditors."*In re Hinsley,* 201 F.3d at 644 (quoting *Viscount Air Svcs, Inc. v. Cole (In*

*re Viscount Air Servs., Inc.),* 232 B.R. 416, 435 (Bankr. D. Ariz. 1998)).

14.     Here, the Debtor's transfer of $225.90 from his personal account at Colonial Bank

to another account he held for doing business as his sole proprietorship, "DFW Design," at Bank

of America satisfied the Debtor's personal obligation on the overdrawn account.  Transferring

funds from one personal account to another personal account, albeit a d/b/a account, does not

---

[5] With respect to the first challenged transfer, DFW Design LLC argued in closing that the $225.90 transfer from the Debtor's personal account to the account he held for DFW Design as its sole proprietor was not a "transfer" within the meaning of TUFTA.  DFW Design LLC argued that by moving money from one account to another, the Debtor in no way "disposed of" or "parted with" funds.  *See* 11 U.S.C. § 101(54) (defining "transfer").  TEX. BUS. COM. CODE § 24.002(12) (same).  The Valks did not address this argument in their reply.

constitute a "transfer" for purposes of TUFTA.  *See* TUFTA § 24.002(12) (defining "transfer").[6]
To the extent moving money between his bank accounts was a "transfer," the Debtor received
reasonably equivalent value in the form of the payment of a valid debt he owed.  TUFTA §
24.004(a) specifically provides that "value" includes satisfaction of an antecedent debt.  TEX. BUS.
& COM. CODE § 24.004(a).

15.    Turning to the Debtor's subsequent transfer of $25,000 from his personal account
to DFW Design LLC's account at Colonial Bank, DFW Design LLC argues in closing:

> [T]he Debtor's transfer to the Defendant of a capital injection needed to pay
> creditors … was also made in the ordinary course of the Debtor's business in order
> to satisfy legitimate debts of the Defendant.  The Debtor and the Defendant worked
> in concert and each role served by one of the entities provided value to both.  Debtor
> in fact did benefit from his transfer of funds to the Defendant in that the Defendant
> was able to continue to pay its creditors and therefor able to continue to conduct
> business without financial disruption.  Similarly, Defendant benefitted through the
> ability to continue paying its bills….  As a result, the Debtor received reasonably
> equivalent value in exchange for the transfers.

16.    DFW Design LLC also argues that, in determining whether a debtor received
reasonably equivalent value, "[c]ourts have considered such indirect financial effects as, for
example, the synergy realized from joining two enterprises, the increase in a credit line, and the
increased monetary 'float' resulting from guarantying the loans of another, as constituting value
received under § 548."  *Matter of Fairchild Aircraft Corp.*, 6 F.3d 1119, 1127 (5th Cir. 1993)
(citations omitted).

17.    In this case, however, the net effect of the $25,000 transfer on the Debtor's estate
was a loss of $25,000. DFW Design LLC was winding down as evidenced by its empty bank
account at the end of March 2016.  The Debtor's transfer of $25,000 to DFW Design LLC was not

---

[6] TUFTA defines a "transfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance."  TEX. BUS. & COM. CODE § 24.002(12).

intended to and did not allow DFW Design LLC to continue in business, merge with another business, or produce any positive value or "synergy" for the Debtor. The Debtor was using his personal funds to pay DFW Design LLC's outstanding debts, and he transferred the $81.08 that remained in DFW Design LLC's account back to himself at the end of the month.

18.     The Debtor's testimony that the $25,000 was a capital injection into DFW Design LLC only serves to prove up the Valks' fraudulent transfer claim. The Debtor transferred funds to an entity (DFW Design LLC) for the alleged purpose of paying that entity's creditors at the expense of his own creditors. The transfer was not a capital contribution to DFW Design LLC. Rather, the Debtor simply moved his funds to DFW Design LLC's account, thereby preventing his creditors from reaching those funds. The Debtor then used the transferred funds to pay certain creditors while others remained unpaid.

19.     Based on the Court's review of the documentary evidence and its assessment of the credibility of the witnesses who testified at trial, the Court finds and concludes that the Debtor transferred $25,000 with the actual intent to put those funds beyond the reach of his own creditors. The Debtor then used the funds he had transferred to DFW Design, LLC in whatever way he wanted, including paying some of his personal debts.

*Insolvency*

20.     DFW Design LLC disputes that the $25,000 transfer involved substantially all the Debtor's assets or that the Debtor was insolvent at the time of the challenged transfer. Under TUFTA, a debtor is insolvent if "the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." Tex. Bus. & Com. Code. § 24.003(a). In addition, "[a] debtor who is generally not paying the debtor's debts as they become due is presumed to be insolvent." Tex. Bus. & Com. Code. § 24.003(b).

21.     TUFTA § 24.003(a) parallels the Bankruptcy Code's approach to insolvency.  The Bankruptcy Code, like TUFTA § 24.003(a), defines insolvency as a "financial condition such that the sum of [the] entity's debts is greater than all of [its] property, at a fair valuation ...."  11 U.S.C.A. § 101(32).  "Courts refer to this as a balance sheet test, and engage in the "fair valuation" of the debts and property shown on the debtor's balance sheet."  *Sherman v. FSC Realty LLC* (*In re Brentwood Lexford Partners, LLC*), 292 B.R. 255, 268 (Bankr. N.D. Tex. 2003) (citing *In re Lamar Haddox Contractor, Inc.*, 40 F.3d 118, 121 (5th Cir. 1994)).

22.     Alternatively, to establish a presumption of insolvency under § 24.003(b), "various factors are relevant to determine whether a debtor's payment of its debts shows insolvency." *Williams v. Hous. Plants & Garden World, Inc.*, 508 B.R. 19, 30–31 (S.D. Tex. 2014) (quoting *In re Arriola Energy Corp.*, 74 B.R. 784, 790 (S.D. Tex. 1987)).  "Among them are the number and amount of the unpaid debts in relation to the size of the debtor's operation; the age and number of unpaid debts; the total amount of indebtedness; and the number of unpaid creditors[.]"  *Id.  See also Janvey v. Dillon Gage, Inc. of Dallas*, 856 F.3d 377, 387 (5th Cir. 2017) (discussing TUFTA § 24.003(b)).

23.     In their closing, the Valks argued that the Debtor was insolvent when he made the challenged transfers based on the balance sheet test.  The Valks drew this Court's attention to the Debtor's bank statements, his credit card statements, his SOFA, and the damages various individuals were seeking from him in lawsuits.  The Valks' argument, which only includes cash assets such as funds in bank accounts and excludes non-cash assets such as receivables and the Debtor's interest in TV Arrowhead, is incomplete and insufficient to meet the balance sheet test for insolvency under TUFTA § 24.003(a).  However, the Valks established that the Debtor was not paying his debts as they came due and was presumptively insolvent under TUFTA § 24.003(b).

24.     The Debtor's bank statements show that he moved large sums through his accounts each month.[7]  The Debtor's bank and credit card statements also show that when he occasionally received large payments for construction projects, he promptly used the funds to pay personal and business debts.  The Debtor, however, was accruing more debt than his income could pay.  The Debtor maintained balances on numerous credit cards, and several large judgments were entered against him in the years prior to bankruptcy, which he did not pay.  The Debtor failed to pay all his federal income taxes for many years prior to bankruptcy.  The Debtor also was a defendant in several cases seeking, collectively, hundreds of thousands of dollars in damages against him when he filed for bankruptcy.

25.     The Debtor did not have sufficient income to pay all his debts as they came due during the relevant time period.  He continued to pay his personal debts and operate his businesses by delaying payments to some creditors, not paying others (especially his judgment creditors), and juggling money between various accounts and entities.  Thus, a presumption of insolvency arose in this case under TUFTA § 24.003(b).  DFW Design LLC failed to rebut that presumption.

26.     DFW Design LLC argued at trial that the Debtor was solvent when he made the $25,000 transfer in March 2016 because he had a home worth at least $200,000 and he anticipated being paid approximately $435,000 for his work for the Valks and Valk-related entities.  The Debtor did, in fact, receive the anticipated payment for his work in May 2016.

27.     However, exempt property such as a homestead is excluded from a debtor's assets for purposes of determining insolvency under TUFTA.  *See* Tex. Bus. & Com. Code § 24.002(2) (defining "asset" to exclude "property to the extent it is generally exempt under non-bankruptcy

---

[7] The Valks introduced into evidence several binders filled with bank and credit card statements for accounts belonging to the Debtor.  Their closing statement contains an analysis of those records.

law).  *See also* 11 U.S.C. § 101(32)(a)(ii) (excluding exempt property from the definition of insolvency).  Moreover, in March 2016, the Debtor was accruing more debt than the anticipated payments from the Valks could cover – as evidenced by bank and credit card statements as well as how quickly the Debtor spent all the funds he received from the Valks in May 2016.[8]

*Fraudulent Business Scheme*

28.     Finally, as an additional badge of fraud, the Valks presented the testimony of Jeremy Haltom to establish that the Debtor was operating DFW Design LLC as a fraudulent business scheme at the time of the challenged transfers.  The Valks cite *S.E.C. v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007), where the Fifth Circuit stated that "proving that [the debtor-transferor] operated as a Ponzi scheme establishes the fraudulent intent behind the transfers it made."  However, the preponderance of the evidence at trial did not establish that the Debtor was operating a Ponzi scheme or a similarly fraudulent business enterprise.

29.     Haltom has asserted legal claims against the Debtor about how his investment in DFW Design LLC was used, and he has asserted that the investment opportunity the Debtor presented to him in February 2013 was a "hoax."  Haltom's claims for fraud and misrepresentation might be a basis to find that the Debtor's obligations to him are non-dischargeable under § 523 of the Bankruptcy Code.  But this proceeding is an action seeking to establish that the Debtor fraudulently transferred funds to DFW Design LLC to place them beyond the reach of his personal creditors.  There is no relationship between Haltom's alleged investment in DFW Design LLC and the transfers at issue here.

---

[8] The Debtor also contended that he was solvent because his bank records show that he transferred $100,000 from one of his personal accounts to another after he received the payment from the Valks.  The Debtor, however, failed to produce any documentary evidence as to how he used the transferred funds.  Further, the Debtor's testimony generally did not distinguish between his personal debts and the debts and income of his businesses.

30.     In summary, the preponderance of the evidence established that the Debtor did not have sufficient income to pay all his debts as they came due when he transferred $25,000 to DFW Design LLC.  The Debtor made the $25,000 transfer from his personal account to a company that could not pay its own bills and that he was winding down.  The Court finds and concludes that the Debtor transferred $25,000 to DFW Design LLC "with actual intent to hinder, delay, or defraud," TEX. BUS. & COM. CODE § 24.005(a)(1), the Debtor's own creditors.

31.     Notably, TUFTA requires a plaintiff to prove that a transfer was made with the intent to "hinder, delay, *or* defraud" creditors.  TEX. BUS. & COM. CODE § 24.005(a)(1) (emphasis added).  As the court in *In re Brentwood Lexford Partners, LLC*, 292 B.R. 255 (Bankr. N.D. Tex. 2003), explained:

> Under both the Bankruptcy Code and Texas law, the intent to hinder or delay or defraud are three separate elements. Each one on its own may make a transfer fraudulent. Thus, an intent merely to delay, but not ultimately prevent, a creditor from being repaid is generally sufficient to trigger the requisite culpability required by the statute.

*Id.* at 262–63.  Thus, in this case, the Debtor's transfer of $25,000 to DFW Design was made with the requisite intent to hinder and delay his own creditors by moving funds beyond their reach.

**Constructive Fraudulent Intent**

32.     The Valks bring their constructively fraudulent transfer claim under §§ 24.005(a)(2) and 24.006(a) of TUFTA.  Under the former, a transfer is constructively fraudulent if the debtor made the transfer:

> without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

TEX. BUS. & COM. CODE § 24.005(a)(2).  Under § 24.006(a):

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

33.     Thus, to prove a claim under TUFTA for a transfer made with constructive intent to defraud, the Valks must show: (i) a creditor, (ii) a debtor, (iii) the debtor transferred assets before the creditor's claim arose or within a reasonable time after the creditor's claim arose, (iv) lack of reasonably equivalent value for the transfers, and (v) the transferor was financially vulnerable or insolvent at the time of the transaction.  TEX. BUS. & COM. § 24.005(a)(1), 24.006(a); *see also Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 566, n. 21 (Tex. 2016) (discussing actual and constructive fraud under TUFTA).

34.     TUFTA provides a specific market-value definition of "reasonably equivalent value."  TUFTA defines "reasonably equivalent value" as including, "without limitation, a transfer or obligation that is within the range of values for which the transferor would have sold the assets in an arm's length transaction."  TEX. BUS. & COM. CODE § 24.004(d).

35.     Here, for the reasons previously discussed, the first transfer of $225.90 to DFW Design LLC was not made with the actual or constructive intent to defraud (to the extent it was even a "transfer").  The second transfer of $25,000 was – the Debtor did not receive reasonably equivalent value in exchange, and the transfer was made at a time he was not paying his debts as they came due.  The Debtor transferred $25,000 to DFW Design LLC's account and then used that account as a personal piggy bank.

**Good Faith**

36.     If a transfer is voidable as fraudulent, TUFTA provides a good faith defense for any

transferee or subsequent transferee who accepted the fraudulent transfer "in good faith and for a

reasonably equivalent value." TEX. BUS. & COM. § 24.009(a).  An entity invoking this affirmative

defense bears the burden of establishing good faith.  *Hahn v. Love,* 321 S.W.3d 517, 526 (Tex.

App. – Houston [1st Dist.] 2009, pet. denied).

37.     In its closing statement, DFW Design LLC raised the issue of good faith in one

paragraph.  DFW Design LLC argued:

> [T]he Defendant in this case has demonstrated that it took [the $25,000 transfer] in
> good faith and for reasonably equivalent value.  The Defendant used the funds from
> its 90% shareholder to pay legitimate debts.  As also laid out above, reasonably
> equivalent value  exists where both the transferor and transferee are working toward
> a common goal.

38.     DFW Design LLC's argument that it was working with the Debtor toward a

"common goal" of paying "legitimate" debts does not distinguish between the Debtor's personal

obligations and those of DFW Design LLC.  The Debtor decided to make a $25,000 transfer to

DFW Design LLC from his personal account.  And then the Debtor, as the 90% owner and person

in control of DFW Design LLC, decided how the transfer would be spent, that is, whether to use

the funds to pay personal or business creditors and which creditors to pay.

39.     Further, where a transferee is an insider and knows the transferor is insolvent at the

time of the transfer, it cannot be a good faith transferee.  *Flores v. Robinson Roofing & Const. Co.*,

161 S.W.3d 750, 756 (Tex. App. – Ft. Worth, 2005) (citing *Putman v. Stephenson,* 805 S.W.2d

16, 20 (Tex. App. – Dallas 1991).  In general, an insider is "an entity whose close relationship with

the debtor subjects any transactions made between the debtor and the insider to heavy scrutiny."

*Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.,* 80 S.W.3d 601, 609 (Tex. App. – Houston

[1st Dist.] 2002)).  *See also* TEX. BUS. & COM. CODE § 24.002(7) (providing that "insider" to individual debtor includes, among others, "a relative of the debtor or a general partner of the debtor," "a partnership in which the debtor is a general partner," or "a corporation of which the debtor is a director, officer, or person in control").  The principal factors in determining insider status are: (i) the closeness of the relationship between the transferee and debtor; and (ii) whether the transactions were at arm's length.  *Tel. Equip. Network, Inc.*, 80 S.W.3d at 609.

40.    Inasmuch as the Debtor owned more than 90% of DFW Design LLC, and was in control of the entity, DFW Design LLC was an insider of the Debtor.  The Debtor's transfer to DFW Design LLC was not an arms-length transaction.  The Debtor made the $25,000 transfer to DFW Design with the actual or constructive intent to hinder, delay or defraud his own creditors. The Debtor did not receive reasonably equivalent value in exchange, and DFW Design LLC, which the Debtor controlled, knew of the Debtor's insolvency.  DFW Design LLC's good faith defense, therefore, fails.

## CONCLUSION

For the foregoing reasons, the Court finds and concludes that the Valks established that the Debtor made a transfer to the Defendant, DFW Design LLC, with the actual or constructive intent to hinder, delay or defraud creditors in the total sum of $25,000, which may be avoided and the value of which may be recovered under 11 U.S.C. §§ 544(b) and 550.  The Court will enter a separate Judgment consistent with the findings of fact and conclusions of law embodied in this Memorandum Opinion.

Signed on 03/31/2023

*Brenda T. Rhoades*                SD

HONORABLE BRENDA T. RHOADES,
CHIEF UNITED STATES BANKRUPTCY JUDGE